IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. _____ |
| ) | |
| v. ) | 18 U.S.C. § 371 (Conspiracy) |
| ) | 15 U.S.C. § 78dd-2 (Foreign |
| DALLAS AIRMOTIVE, INC. ) | Corrupt Practices Act) |
| ) | |
| Defendant. ) | |

3-14CR-483-D

## INFORMATION

The United States charges that, at all times relevant to this Information, unless otherwise stated:

### INTRODUCTION

1. The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign government official for the purpose of obtaining or retaining business for, or directing business to, any person.

2. The defendant, Dallas Airmotive, Inc. ("DAI"), was headquartered in Grapevine, Texas, incorporated in Texas, and thus a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B). DAI was in the business of providing aircraft engine maintenance, repair, and overhaul ("MRO") services to customers in the United States and abroad. Part of DAI's business was to service aircraft engines owned and operated by a number of governmental and other customers in Latin America, including in Brazil, Argentina,

1

and Peru.

3. Dallas Airmotive do Brasil ("DAB"), headquartered in Belo Horizonte, Brazil, was a corporate affiliate under the direction and control of DAI. DAB assisted DAI in providing MRO engine services to customers in Latin America, including to governmental and other customers. DAB also bid on and secured engine service contracts with Brazilian government and commercial customers, the work for which was often done in part by DAI. DAB's employees were supervised and managed by directors and managers at DAI.

4. "DAI Sales Director" was a regional sales director at DAI from in or around 2004 to in or around 2013. DAI Sales Director was responsible for overseeing DAI's sales efforts in Latin America.

5. "DAI Sales Agent" was a regional sales manager at DAI from in or around 2005 to in or around 2009. From in or around 2009 until in or around 2013, DAI Sales Agent was first a national sales manager at DAB and later a general manager at DAB, working under the supervision of, and reporting to, DAI. DAI Sales Agent was responsible for obtaining and retaining MRO business for DAI and DAB in Latin America, including with commercial and government customers.

6. "DAI Sales Manager" was a regional sales manager at DAI from in or around 1999 to in or around 2011. DAI Sales Manager was responsible for obtaining and retaining MRO business for DAI in Latin America, including with commercial and government customers.

7. "DAB Manager A" was a general manager at DAB from in or around 2009 to in or around 2013, working under the supervision of, and reporting to, DAI. DAB Manager A was responsible for obtaining and retaining MRO business for DAI and DAB in Brazil, including with commercial and government customers.

8. "DAB Manager B" was a sales and customer support manager at DAB from in or around 2009 to in or around 2014, working under the supervision of, and reporting to, DAI. DAB Manager B was responsible for obtaining and retaining MRO business for DAI and DAB in Brazil, including with government customers.

9. The Força Aérea Brasileira (the "Brazilian Air Force" or "BAF") was one of three national uniformed services of the Federative Republic of Brazil and an "agency" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). The BAF was a customer of DAI.

10. The Fuerza Aérea del Peru (the "Peruvian Air Force") was a branch of the Peruvian Armed Forces and an "agency" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). The Peruvian Air Force was a customer of DAI.

11. The Office of the Governor of the Brazilian State of Roraima was a "foreign government," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). The Office of the Governor of Roraima was a customer of DAI and DAB.

12. The Office of the Governor of the Argentinean State of San Juan was a "foreign government," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). The Office of the Governor of San Juan was a customer of DAI.

13. "Official 1" was a Sub-Officer in the BAF who had the ability to influence the award of MRO business to DAI and DAB. Official 1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

14. "Official 2" was a Sergeant in the BAF who had the ability to influence the award of MRO business to DAI and DAB. Official 2 was a "foreign official," as that term is used in

the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

15. "Official 3" was a Captain for the Governor of the Brazilian state of Roraima who had the ability to influence the award of MRO business to DAI and DAB. Official 3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

16. "Front Company A" was a Brazil-based sales and logistics services company that was affiliated with Official 1. DAI and DAB made payments to Front Company A for the purpose of disguising payments to Official 1 in exchange for his assistance in securing MRO business for the benefit of DAI under a previously awarded master services agreement.

17. "Front Company B" was a Brazil-based sales and logistics services company that was beneficially owned by Official 1. DAI and DAB made payments to Front Company B for the purpose of disguising payments to Official 1 and Official 2 in exchange for their assistance in securing MRO business for the benefit of DAI.

18. "Intermediary Company" was a Brazil-based company that was used to make payments for the benefit of Official 3 in exchange for his assistance in securing MRO business for the benefit of DAI and DAB.

## COUNT ONE
### (Conspiracy)

19. Paragraphs 1 through 18 are realleged and incorporated by reference as though fully set forth herein.

20. From in or around 2008, and continuing through in or around 2012, in the Northern District of Texas and elsewhere, the defendant, DALLAS AIRMOTIVE, INC., did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate and agree with DAI Sales Director, DAI Sales Agent, DAI Sales Manager, DAB

Manager A, DAB Manager B, Official 1, Official 2, Official 3, Front Company A, Front Company B, Intermediary Company, and others, known and unknown, to commit an offense against the United States, that is, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist DAI and others in obtaining and retaining business for and with, and directing business to, DAI and others, in violation of Title 15, United States Code, Section 78dd-2(a).

## PURPOSE OF THE CONSPIRACY

21. The purpose of the conspiracy was to obtain and retain engine MRO service business for DAI and DAB from foreign government customers in Latin America, including the Brazilian Air Force, the Peruvian Air Force, the Office of the Governor of the Brazilian State of Roraima, and the Office of the Governor of the Argentinean State of San Juan, by paying bribes to foreign officials employed by such customers.

## **MANNER AND MEANS OF THE CONSPIRACY**

22. The manner and means by which DAI and its co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

23. DAI, through its employees and agents, including employees of DAB, would and did discuss in person and via electronic mail ("e-mail") making bribe payments — which they called "commissions" or "consulting fees" — and granting other benefits to employees of customers, including foreign government customers, in order to obtain and retain for DAI and DAB business to perform engine MRO services.

24. DAI, through its employees and agents, including employees of DAB, would and did offer to pay, promise to pay and authorize the payment of money and other benefits, directly and indirectly, to and for the benefit of employees of foreign government customers, to help DAI and DAB obtain or retain MRO business with the foreign government customers by which they were employed.

25. DAI, through its employees and agents, including employees of DAB, would and did discuss in person and via e-mail the manner and means by which the bribe payments were to be made, including who should be listed as owners and beneficiaries of Front Company A and Front Company B and the names and locations of the bank accounts to which the bribe payments should be transferred.

26. DAI, through its employees and agents, including employees of DAB, would and did attempt to conceal the payments to foreign officials by using Front Company A, Front Company B, and Intermediary Company to effectuate payments from DAI and DAB to Brazilian military officials.

27. DAI, through its employees and agents, including employees of DAB, would and did wire and cause to be wired certain bribe payments from DAI's bank account in New York and DAB's bank account in Belo Horizonte, Brazil, to bank accounts of Front Company A, Front Company B, and Intermediary Company in Brazil.

28. DAI, through its employees and agents, including employees of DAB, would and did discuss in person and via e-mail paying for a vacation for Official 2 and his spouse in exchange for Official 2's assistance in securing MRO business for DAI.

29. DAI, through its employees and agents, including employees of DAB, would and did pay for a vacation for Official 2 and his spouse in exchange for Official 2's assistance in securing MRO business for DAI.

30. DAI, through its employees and agents, would and did wire and cause to be wired certain bribe payments from DAI's bank account in New York to the bank account of a third party commercial representative in Miami, Florida, while knowing that the funds, at least in part, would be passed to officials of the Peruvian Air Force.

31. DAI, through its employees and agents, would and did wire and cause to be wired certain bribe payments from DAI's bank account in New York to the bank account of a third party commercial representative in Argentina, while knowing that the funds, at least in part, would be passed to officials in the office of the Governor of the Argentinean State of San Juan.

## OVERT ACTS

32. In furtherance of the conspiracy and to achieve its purpose and object, at least one of the conspirators committed, and caused to be committed, in the Northern District of Texas, and elsewhere, the following overt acts, among others:

33. On or about February 7, 2008, DAI Sales Agent sent an e-mail to DAI Sales Director and several other DAI employees, informing them of an increase in the commission amount DAI was going to pay to a third-party commercial representative in Argentina in order to enable the third party commercial representative to "pay to end user," an individual in the Office of the Governor of San Juan, Argentina, a commission of $5,000.

34. On or about March 11, 2008, DAI Sales Agent sent an e-mail to DAI Sales Director and a third-party commercial representative regarding engine work for the Governor of San Juan, stating, as translated, "Attached is the closing price for the Government's engines. I need your authorization to proceed with the repair."

35. On or about March 14, 2008, the third-party commercial representative responded to the e-mail referenced in Paragraph 34 above, removing DAI Sales Director from the e-mail and stating that the work authorization estimate should build in a $15,000 commission per engine.

36. On or about March 27, 2009, in response to a mistaken addition of $3,000 to a BAF invoice relating to a previously awarded master services agreement, DAB Manager A sent an e-mail to a DAI employee, copying DAI Sales Director and DAI Sales Agent, stating that they should keep the additional $3,000 in the invoice "for future needs. For example, as we discussed I will send [Official 1] to Dallas to explain us their log books, etc. He is helping a lot on the approvals."

37. In or around July 2010, in response to DAI Sales Agent's statement that Official 1 was affiliated with Front Company A and would receive the commissions paid to Front Company A, DAI Sales Director instructed that as long as Official 1 was not on Front Company A bylaws or was not the owner of Front Company A, there would be no problem.

38. On or about July 8, 2010, DAI Sales Agent sent an e-mail to Official 1, stating, as translated, "Please fill out with your company's information. The address must be in the same country as the address of your bank account. I am waiting for this to be completed so we can do the representation contract [with Front Company A] and start consulting immediately."

39. On or about July 9, 2010, Official 1 forwarded bank information to DAI Sales Agent, stating, as translated, "As per our conversation, I'm sending the company info. Don't worry, the company here in Rio shows my name as a partner and for that reason I wouldn't be able to do business with you since [a previously awarded master services agreement between BAF and DAI], TCU [the Brazilian Court of Audit of the Union that is tasked with investigating public corruption] doesn't allow, hahaha."

40. On or about July 9, 2010, DAI Sales Agent responded to Official 1's e-mail referenced in Paragraph 39 above, stating, as translated, "I need [the commercial/finance director of Front Company A] to fill out and sign the Form that I sent you and provide the banking information...I can only do the contract with him."

41. On or about July 11, 2010, DAI Sales Agent forwarded the e-mail referenced in Paragraph 40 above to DAI Sales Director and another DAI employee.

42. On or about July 15, 2010, DAI Sales Agent sent an e-mail to Front Company A's commercial/finance director, copying Official 1, and attaching a proposed commercial representation agreement between DAI and Front Company A that made no reference to Official 1.

43. On or about July 15, 2010, DAI Sales Director replied to an e-mail from DAI Sales Agent with the subject line "RE: [Front Company A] Account Info for Commissions and Credit," stating, "Who is getting commissions for engines that come to us from the BAF?"

44. On or about July 15, 2010, DAI Sales Agent responded to the e-mail from DAI Sales Director referenced in Paragraph 43 above, stating, "[Official 1], will explain tonight."

45. On or about July 29, 2010, DAB Manager B forwarded to DAI Sales Agent an e-mail that he had sent to Official 1 and Front Company A's commercial/finance director, attaching the modified contract with Front Company A, which again concealed Official 1's involvement, stating, as translated, "here's [Official 1's] agreement, signed."

46. On or about August 2, 2010, DAI Sales Agent forwarded to DAI Sales Director and another DAI employee the e-mail referenced in Paragraph 45 above.

47. In or around August and September 2010, DAI Sales Director and DAI's Head of International Sales signed the commercial representation agreement with Front Company A.

48. On or about December 7, 2010, Official 3 sent an e-mail from his personal e-mail address to DAB Manager B at his personal e-mail address, in which, as translated, Official 3 instructed DAB Manager B to prepare a pre-budget of $300,000, after which various expenses would be added "for everything to total around $350,000, which was how much I told the Gov [sic] this maintenance would cost. Send the budgets to me at [Official 3's personal e-mail address], unofficially (if possible, both the actual and the 'complete' budgets), so that I can present it to the Gov [sic] for information only...Sorry for the request to use private e-mail but these issues involving amounts and decisions are 'sensitive,' you are well aware of that, which is why I asked if there was a deal like the 'glorious' one..."

49. On or about February 8, 2011, Official 1 sent an e-mail from his personal e-mail address to DAI Sales Agent requesting from DAI Sales Agent, as translated, "a favor [to] see what the situation is concerning the commission arranged on the billed engines. I want to make an investment here this month and I would like to have an estimate on the payments, if possible."

50. On or about March 2, 2011, DAB Manager B forwarded to DAI Sales Agent and DAB Manager A the contract between DAI and Front Company A, stating, as translated, "[Official 1's] contract. It is dated 9/3/2010 and signed by [DAI's Head of International Sales]."

51. On or about April 26, 2011, DAI Sales Agent sent an e-mail to DAB Manager A and DAB Manager B concerning a commission requested by a third party commercial representative regarding motors from the Governor of the Brazilian state of Roraima, noting, as translated, "I do not want to pay twice and prefer to pay [the third party commercial representative], and much less that [Official 3] receive double…My idea is something reasonable for [Official 3], much less than the request."

52. On or about April 26, 2011, a retired Commander of the Peruvian Air Force who worked for a third party commercial representative sent an e-mail to DAI Sales Manager, copying DAI Sales Director and the third party commercial representative, stating, as translated, that he secured payment to DAI by the Peruvian Air Force and that "we have to share the agreed to commission with the people who have helped us."

53. On or about April 28, 2011, the retired Commander of the Peruvian Air Force referenced in Paragraph 52 above sent an e-mail to DAI Sales Director, copying DAI Sales Manager and the third party commercial representative, with the subject line "Payment of Commission," stating, as translated, "You know that I am a retired Commander of the Air Force, I have flown a lot, …I am highly regarded, I am friends with everyone in [the Peruvian Air Force], but Dallas Airmotive's delay in the agreed upon commission payment is harming me since I have never faltered in complying with my promises. I am extremely worried, principally because there are 4 people that call me every day for me to pay them what was agreed to, and the

gravest part is that we are losing work, because they don't solicit repairs or sale of replacement parts."

54. On or about April 29, 2011, DAI Sales Director responded to the e-mail referenced in Paragraph 53 above, stating, "I am sorry for the delay associated with this process but I am aware that a few things changed along the way. [DAI Sales Manager] and I are working through this and we hope to have everything resolved by next week."

55. On or about April 29, 2011, the retired Commander of the Peruvian Air Force responded to the e-mail referenced in Paragraph 54 above, stating, as translated, "I was very happy to receive your email, with this reply I am confident in your word and will tell my friends that the payment will not be made later than next week."

56. On or about November 7, 2011, Official 2 sent an e-mail to DAB Manager B with the subject line "Transfer of Amounts," asking DAB Manager B to confirm the deposits from invoices and noting, as translated, that "I imagine there may have been some mistake in the information because I didn't receive it yet."

57. On or about December 16, 2011, DAI Sales Agent forwarded an e-mail to DAI Sales Director with the subject "FW: Nota [Official 2]," stating, "on [a master services agreement previously awarded by BAF to DAI] we are paying the trip for our main contact [Official 2] on [DAB Manager B's] expenses under DAB. This is for you to understand the charges we try to recover on the engines we send." Attached to the e-mail was an invoice for air travel that contained the names of Official 2 and family members.

58. On or about December 16, 2011, DAI Sales Director responded to the e-mail referenced in Paragraph 57 above, stating, "Bien! Thank you for the clarification."

59. On or about January 3, 2012, DAB Manager B sent an e-mail to Official 2 concerning the vacation for Official 2 sponsored by DAB, stating, as translated, "[t]ell me, my friend, is everything alright there?? And the hotel is so-so or worth the expense??? I hope that you are enjoying it."

60. On or about January 4, 2012, Official 2 responded to the e-mail referenced in Paragraph 59 above, stating, as translated, "When I said I had confidence in your good taste, I confess that I underestimated you...hehe The Hotel was excellent. I believe that it was a great present to [Official 2's wife]. She insists on passing on thanks to you. Great job, my good friend!!!"

61. On or about February 5, 2012, DAB Manager B sent an e-mail to DAI Sales Agent to propose a third party commission of $20,000 for "[Official 1's] company."

62. On or about February 5, 2012, DAI Sales Agent responded to the e-mail referenced in Paragraph 61 above, stating that the payments to Front Company B were in fact intended for Official 2.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### (Foreign Corrupt Practices Act)

63. Paragraphs 1 through 18 and 21 through 62 are realleged and incorporated by reference as though fully set forth herein.

64. On or about April 5, 2012, in the Northern District of Texas and elsewhere, the defendant, DALLAS AIRMOTIVE, INC., being a domestic concern, did knowingly make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person,

while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist DAI and others in obtaining and retaining business for and with, and directing business to, DAI and others, to wit: a wire transfer in the amount of $35,000 from New York to Rio de Janeiro, Brazil for the benefit of Official 1 and Official 2, in exchange for their assistance in providing engine MRO business to DAI.

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

SARAH R. SALDAÑA
UNITED STATES ATTORNEY

*/s/ Michael C. Elliott*

MICHAEL C. ELLIOTT
Assistant United States Attorney
New York Bar
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: (214) 659-8600
Facsimile: (214) 659-8803

*/s/* — DOJ Trial Attorney
for DAVID M. FUHR
Trial Attorney
New York Bar
United States Department of Justice